IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Profit Energy Company,

      Plaintiff,

    v.

Gulfport Energy Corporation,

      Defendant.

Case No: 2:19-cv-3487

Judge Graham

Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiff Profit Energy Company brings this action against Gulfport Energy Corporation for breach of contract and breach of the implied covenant of good faith and fair dealing.  Profit and Gulfport are parties to a sublease under which Gulfport pays Profit a royalty on revenue from the production of oil and gas.  The parties disagree over how the royalty should be calculated.  Their dispute concerns certain wells which were drilled within the subleased land but whose production area reaches unencumbered acreage outside the subleased land.  Profit alleges that its royalty cannot be reduced by the percentage of production attributable to the unencumbered acreage; Gulfport says that it should be reduced.

This matter is before the court on Gulfport's motion to partially dismiss the complaint.  For the reasons which follow, the motion to dismiss is denied in primary part.

## I.    Background

Profit Energy is an Ohio corporation.  On August 17, 2011, Profit entered into an Oil and Gas Sublease with HG Energy, LLC, which is the predecessor-in-interest to Gulfport Energy.  Gulfport is a Delaware corporation with its principal place of business in Oklahoma.

Under the Oil and Gas Sublease, Profit subleases 32 oil and gas leases to Gulfport.  Those 32 leases cover 1,275.935 acres in Monroe County, Ohio.  <u>See</u> Compl., ¶ 9.  At the time the Sublease was executed, the parties contemplated that HG Energy would execute subleases with other sublessors in Monroe County on contiguous properties.  HG Energy did so, and the additional subleases are referred to as "Related Subleases."  <u>See</u> Sublease, ¶ 11.  HG acquired subleases to a total of 26,146.3458 acres, which includes the acres subleased by Profit.  <u>See</u> Compl., ¶ 19.

An important term in this lawsuit is "Unit." The Sublease uses the term often (sometimes capitalized, sometimes not), but does not expressly define it. A fair reading of the Sublease is that the Unit is the total acreage encumbered by the Sublease and the Related Subleases. See Sublease, ¶ 11 (referring to the total acreage covered by the subleases as the "Unit"). In their respective court filings, both parties adopt this understanding of the term "Unit." See Compl., ¶ 12 ("The acreage described in the Sublease and Related Subleases was combined into a 'Unit.'"); Motion to Dismiss, pp. 4-5.

Profit received $1,000 per acre for each of the 1,275.935 subleased acres. See Sublease, ¶ 7. The Sublease gives Gulfport the right to drill and operate wells and to produce all oil and gas on the subleased lands. Id., ¶ 1. It further provides that the sublessee "shall have the right but not the obligation to pool all of any part of the subleased premises or interest therein with any other lands or interests . . . whenever sublessee in its sole discretion deems it necessary or proper to do so in order to develop or prudently operate the leased premises." Id., ¶ 5.

At issue in this case is the royalty payment which Gulfport is to pay Profit on a recurring basis. The royalty is addressed in Paragraph 11 of the Sublease. The parties agree on three important aspects of the royalty payment calculation.

The first point of agreement is that royalty payment is fundamentally tied to the gross revenues received by Gulfport on oil and gas production. The Sublease provides that Profit is to be "paid on the gross revenues" received by Gulfport on production. Id. ¶ 11.

Second, the parties agree on the application of an Over-Riding Royalty Interest (ORRI), set at 1/32. Id. (stating that the ORRI is "one-thirty-second"). Profit has an ORRI of 1/32 on production. This means that gross revenues from production are to be multiplied by 1/32.

Third, the parties agree that the royalty will be reduced by the ratio that the number of the acres subleased by Profit (1,275.935) bears to the total acreage in the Unit. The Sublease provides that Profit agrees to "receive out of the production or the revenue realized . . . such proportional share . . . as the number of Subleasor's Leasehold acres included in the Unit bears to the total number of acres in the Unit." Id.

To represent this calculation as a mathematical equation would be as follows:

Royalty payment = $gross\ revenues\ on\ production$ x $\frac{1}{32}$ x $\frac{number\ of\ acres\ subleased\ by\ Profit}{total\ number\ of\ acres\ in\ the\ Unit}$

It is with the first factor – gross revenues on production – where the parties have a disagreement. What counts as production? The parties' disagreement relates to the "production area"

of a well.  Though the parties use the term "production area" to help describe their dispute, it is not defined or used in the Sublease.[1]  The parties say that a well's production area is the same thing as a well's "unit," which is a term different from the word "Unit" as used in the Sublease.  According to the parties, a well's "unit" is "the acreage considered to be part of a single well."  Doc. 7 at p. 5 n.2; see also Doc. 8 at p. 7 n.3.  A fair interpretation of the parties' discussion is that they are referring to the land, measured in acres, holding the rights to the mineral reserves from which a well produces oil or gas.  See also Bond v. Halcon Energy Properties, Inc., 2017-Ohio-7754, ¶ 7 (Ct. App.) (describing a "well unit" as the acreage from which a horizontally-drilled well drew oil and gas).

The parties disagree over what happens to the royalty calculation when production comes from a well whose production area does not fit entirely within the Unit.  This dispute, as well as the relevant provisions of the Sublease, will be discussed in fuller detail in Part III below.  Briefly stated, Profit claims that production should not be reduced by the share of acreage outside the Unit – all that matters is that a well is located inside the Unit and, if it is, 100% of its production counts toward the royalty payment.  Gulfport counters that the royalty must be reduced proportionately whenever any part of the production area is outside the Unit – what matters is that some portion of production cannot be attributed to the subleased lands.

The complaint asserts two claims.  One is for breach of contract.  The complaint alleges that Gulfport has breached the Sublease in three ways, the first of which is by underpaying the royalty.  Profit asserts that nothing in the Sublease authorizes Gulfport to reduce the royalty payment when a portion of the acreage within the well's production area is outside of the Unit.

The second alleged breach is that Gulfport has withheld payment of the royalty since the time the parties' dispute arose.  Profit contends that it is entitled under the Sublease to receive payment even while there is a dispute over the amount.

The third alleged breach is that Gulfport has deducted from the royalty certain costs relating to "severance tax and gathering."  Profit contends that the Sublease prohibits such deductions.

The complaint also asserts a claim for breach of the implied covenant of good faith and fair dealing.  This claim relates to Gulfport's release of acreage originally subject to the Related Subleases.

---

[1]  The court consulted certain oil and gas glossaries but these sources did not have "production area" as an entry.  See U.S. Occupational Safety & Health Admin., Glossary of Oil and Gas Terms, https://www.osha.gov/SLTC/etools/oilandgas/glossary_of_terms/glossary_of_terms_p.html; Penn State Univ., Marcellus Center for Outreach and Research, Glossary of Terms, http://www.marcellus.psu.edu/resources-glossary-of-terms.html.

Though the number of acres subleased by Profit has not changed, the release means that the Unit now covers 25,920.889 acres instead of the original 26,146.3458 acres. Profit requested documentation and an explanation from Gulfport relating to its decision to release the acreage. Gulfport allegedly refused to do so, and Profit alleges that Gulfport's refusal constitutes a breach of the implied covenant of good faith and fair dealing.

Gulfport has moved to dismiss all of the claims except for the breach of contract claim regarding the deduction of severance tax and gathering costs from the royalty payment.

## II. Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Iqbal, 556 U.S. at 679; Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Twombly, 550 U.S. at 555-56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Twombly, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. Though "[s]pecific facts are not necessary," Erickson, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," Twombly, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Iqbal, 556 U.S. at 678-79; Twombly, 550 U.S. at 555-56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.    Discussion

### A.      Calculation of the Royalty Payment

On the issue of whether the royalty should be reduced whenever part of a well's production area is located outside the Unit, both parties confidently assert that the "clear" and "plain" language of the Sublease supports their respective interpretations. See Doc. 8 at p. 1; Doc. 11 at pp. 1-2. Paragraph 11 of the Subleases provides as follows:

> Sublessor expressly excepts and reserves unto himself, his heirs, successors, and assigns, an overriding royalty interest of one-thirty second (1/32) to be paid on the gross revenues received by Sublessee. Said 1/32 to be paid on production from every well drilled under this Sublease and all other related Subleases. These Subleases presently total approximately 30,000 acres which total acreage constitutes the "Unit" and will be set forth on a map which will be attached as Exhibit B after all related subleases have been signed. Should Sublessor not have good title to any subleased acreage, the size of this unit will be adjusted accordingly. Sublessor agrees to accept and receive out of the production or the revenue realized from the production of such Unit, such proportional share of the ORRI from each Unit well as the number of Sublessor's Leasehold acres included in the Unit bears to the total number of acres in the Unit. Otherwise, as to any part of the Unit, drilling, operations in preparation for drilling, production, or shut-in production from the Unit, or payment of ORRI attributable to any part of the Unit shall have the same effect upon the terms of this Sublease as if a well were located on, or the subject activity attributable to, the subleased acreage in this Sublease. Sublessor and Sublessee understand that the total acreage figure included in the Unit is subject to change depending upon Sublessee's being able to verify the validity of all leases contained in all related subleases and upon Sublessee being satisfied that such leased acreage can be pooled. It is agreed between the Sublessor and Sublessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Sublessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and

marketing the oil, gas and other products produced hereunder to transform the product into marketable form. In no event shall Sublessor receive a price that is less than, or more than, the price received by Sublessee.

Sublease, ¶ 11.

Profit contends that the second sentence of Paragraph 11 controls the outcome of the parties' dispute. "Said 1/32 to be paid on production from *every well drilled* under this Sublease and all other related Subleases." Id. (emphasis added). Profit stresses that the royalty is based on production from "every well drilled." Profit argues that in the fifth sentence of Paragraph 11 the parties agreed to reduce the royalty by the ratio of Profit's subleased acres to the total Unit acres, but that the parties agreed to no further reductions.

Gulfport contends that the fifth sentence of Paragraph 11 controls. "Sublessor agrees to accept and receive out of the production or the revenue realized from the production *of such Unit*, such proportional share of the ORRI from each Unit well as the number of Sublessor's Leasehold acres included in the Unit bears to the total number of acres in the Unit." Id. (emphasis added). Gulfport argues that production is based on Unit acres, not wells. If any part of production comes from a production area outside of the Unit, then the royalty must be reduced accordingly, argues Gulfport.

The court finds that this dispute is not one which can be resolved at the motion to dismiss stage. As the movant, Gulfport bears the burden of demonstrating that the complaint fails to state a claim. Profit's interpretation of the Sublease is plausible. As Profit alleges, the second sentence of Paragraph 11 provides that Profit earns a royalty "on production from every well drilled" under the Sublease and the Related Subleases. The only reductions or qualifiers expressly stated in the Sublease is the ORRI of 1/32 and, in the fifth sentence, the ratio of the number of Profit's subleased acres to the total number of Unit acres.

Gulfport interprets the fifth sentence of Paragraph 11 as expressing an additional reduction, reflected in the phrase "production of such Unit." Even if plausible, Gulfport's interpretation is not supported by such clear and express language in the Sublease as to demonstrate that the complaint fails to state a claim. The subject of the fifth sentence is the reduction for the ratio that the number of Profit's subleased acres bears to the total Unit acres. The argument that the fifth sentence contains a further type of reduction or a represents a qualifier to the meaning of "production" relies on an interpretation which is not apparent from the express language and context of the Sublease. Gulfport contends that the phrase "production of such Unit" must be read as limiting production to acres, not

wells, within the Unit. But the Sublease does not define "production," nor does it directly address the situation the parties are now disagreeing over.

In the absence of clear and direct contractual language establishing how the royalty is to be determined when a portion of a well's production comes from an area outside the Unit, the court may well need to consider industry practice and the parties' course of dealings. Indeed, both sides make reference to these external considerations in their briefs. Gulfport argues that Profit's position conflicts with "industry norms." Doc. 7 at p. 3. Profit contends that Gulfport's position conflicts with the course of dealing that Profit had with Gulfport's predecessor, HG Energy. Doc. 8 at pp. 7-9. Such considerations are not appropriate at the motion to dismiss stage. The court, however, notes that the complaint alleges that Gulfport's position is contrary to the course of dealing which Profit had with HG Energy, and the court must accept this allegation as true at this stage.

Accordingly, the motion to dismiss is denied as to Profit's breach of contract claim relating to the alleged miscalculation of royalty payments.

### B. Withholding of the Royalty Payment

The complaint alleges that Gulfport has breached the Sublease by withholding payment of the royalty since the time the parties' dispute arose. Gulfport moves to dismiss this claim on the grounds that it has a right under the applicable case law to withhold payment.

In their arguments about this claim, the parties use the term "division order." Gulfport argues that it has a right to withhold payment so long as Profit refuses to sign a division order. Profit argues that Gulfport cannot withhold the royalty while insisting that Profit sign a division order whose terms contradict the Sublease. A "division order" is not defined in the Sublease or the complaint, nor is it explained in the briefs. Based on an example of a division order attached to the complaint, the court observes that it is a written document prepared by the sublessee and provided to the sublessor for the sublessor's verification and signature. It identifies the type and amount of interest which the sublessor has in the production of oil and gas in a defined area. In the example provided, HG Energy prepared a division order for Profit stating that the type of interest which Profit has is an ORRI. The ORRI is in oil and gas production from 26,146.348 acres in Monroe County (those acres being defined with greater particularity in a separate document). The amount of interest is expressed as a decimal: 0.0015249920, which is the number of Profit's acres, 1275.935, divided by the number of Unit acres, 26,146.348, and that figure then multiplied by 1/32.

Once signed, the division order is provided to the purchaser of the oil or gas. The order, along with additional division orders relating to other owners of the well or lease, directs the purchaser how

to distribute the purchase price.  The purpose of a division order "is to assure that the purchaser pays only those parties who are entitled to payment."  <u>Blausey v. Stein</u>, 61 Ohio St.2d 264, 267, 400 N.E.2d 408, 410 (Ohio 1980) (citing 4 Williams, Oil and Gas Law, Section 701).

The complaint alleges that Gulfport presented one or more division orders for Profit to sign but the decimal interest calculation in the tendered division orders incorporated Gulfport's disputed position that Profit's royalty payment should be decreased when a well's production area is not located entirely within the Unit.  The complaint alleges that the division orders are unacceptable and that Gulfport must pay the royalty even if Profit refuses to sign them.

Gulfport argues that the Ohio Supreme Court decision in <u>Blausey v. Stein</u> controls.  In <u>Blausey</u>, the owner of land subject to an oil and gas lease refused to sign a division order on the grounds that the lease did not require her to do so.  She claimed that the lessee had an obligation to pay her the royalty payments even if she did not sign the division order.  The Court rejected this argument, finding that signing the division order was not "such a burden" that it would have amounted to a modification of the lease agreement.  <u>Blausey</u>, 61 Ohio St.2d at 267, 400 N.E.2d at 410–11 (1980). The Court observed, "By signing the division order, the lessor is simply verifying that he has a right to royalty payments."

Profit argues that <u>Blausey</u> is distinguishable from the facts alleged in the complaint, and the court agrees.  In <u>Blausey</u>, there was no indication that the division order deviated in any way from the terms of the lease.  The division order was administrative in nature and, according to the Court, merely instructed the purchaser to pay the land owner the royalty to which she was entitled under the lease. In contrast, the complaint here alleges that the division orders prepared by Gulfport contain a royalty payment term which is materially different from that of the Sublease.  According to the allegations, if Profit were to sign one of the division orders, it would risk effecting a modification to the Sublease.

The motion to dismiss is therefore denied as to Profit's breach of contract claim relating to the alleged withholding of royalty payments.

**C.      Release of Acreage**

The complaint alleges that Gulfport released roughly 225 acres from the Unit.  Profit asked Gulfport to provide support for its decision, but Gulfport allegedly refused to do so.  Profit claims that Gulfport's refusal constitutes a breach of the implied covenant of good faith and fair dealing. Gulfport argues that the claim must be dismissed because Ohio does not recognize a stand-alone claim for breach of the implied covenant of good faith and fair dealing.

The court agrees with Gulfport's argument.  "It is well established under Ohio law that, 'an allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim.'"  JP Morgan Chase Bank, N.A. v. Horvath, 862 F.Supp.2d 744, 751 (S.D. Ohio 2012) (quoting Krukrubo v. Fifth Third Bank, No. 07AP–270, 2007 WL 4532689, at *5, 2007 Ohio App. LEXIS 6140, at *12 (Ohio Ct. App. Dec. 27, 2007)).

Recognizing this point, Profit counters that its claim does not stand alone because the complaint alleges several breaches of the Sublease.  This argument fails because Profit's breach of contract claims do not relate to the claim for breach of the implied covenant.  See JP Morgan, 862 F.Supp.2d at 751 (the breach of the implied covenant claim must have a "partner claim for breach of contract").  That is, Profit has not alleged that Gulfport breached the Sublease by releasing the acreage. See Sublease, ¶¶ 5, 11 (giving Gulfport the right to pool and release lands in "its sole discretion" and "depending upon [its] being able to verify the validity of all leases . . . [and] being satisfied that such leased acreage can be pooled").

## IV.  Conclusion

For the reasons stated above, defendant's partial motion to dismiss (doc. 7) is granted in part and denied in part.  The motion is granted as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  The motion is denied as to plaintiff's claims for breach of contract concerning the calculation of the royalty payments and the withholding of royalty payments.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: July 23, 2020